No. 120,704

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

TIMOTHY J. BURCH,
*Appellant*,

v.

LAURA HOWARD, SECRETARY OF
KANSAS DEPARTMENT FOR AGING AND DISABILITY SERVICES,
*Appellee*.

SYLLABUS BY THE COURT

1.

A petition filed under K.S.A. 60-1501 must allege shocking and intolerable conduct or continuing mistreatment of a constitutional stature.

2.

Kansas appellate courts do not decide moot questions. The mootness doctrine stems from Kansas' case-or-controversy requirement. A justiciable controversy involves definite and concrete issues—adverse legal interests that are immediate, real, and amenable to conclusive relief. A case becomes moot when the controversy between the parties has ended and any judgment of the court would be ineffective.

3.

A case is not moot where it may have adverse legal consequences in the future. Given the finality of a mootness determination, an appeal will not be dismissed as moot unless it clearly and convincingly appears that the actual controversy has ceased and the only judgment which could be entered would be ineffectual for any purpose.

4.

Petitioners under K.S.A. 60-1501 only have standing to challenge the Sexual Predator Treatment Program's treatment regimen as it has been applied to them. Without showing the Program violates their individual rights, petitioners have no standing to challenge how the Program impacts others.

5.

Courts have recognized a limited exception to this standing requirement, finding noncompliance with a treatment regimen does not prevent consideration of a petitioner's challenge when the treatment is so lacking that it could be deemed the personnel were indifferent or the requirements of the Sexual Predator Treatment Program were otherwise egregious and shocking.

6.

When a person declines to participate in the Sexual Predator Treatment Program's treatment regimen, there is no way to determine whether the Program's treatment, as applied to that person, has been or will be effective.

7.

The Kansas Sexually Violent Predator Act's reference to a change in a person's "mental abnormality or personality disorder" is part of the ultimate legal test applied by courts assessing whether a person should continue to be committed under the Act. It does not establish or require a certain standard for treatment purposes.

Appeal from Pawnee District Court; BRUCE T. GATTERMAN, judge. Opinion filed February 28, 2020. Affirmed.

*Gerald E. Wells*, of Jerry Wells Attorney-at-Law, of Lawrence, for appellant.

*Jessica F. Conrow*, senior legal counsel, of Kansas Department for Aging and Disability Services, for appellee.

Before BUSER, P.J., SCHROEDER and WARNER, JJ.

WARNER, J.: In 2002, a court committed Timothy Burch to the Sexual Predator Treatment Program at Larned State Hospital. Ten years later, he filed this K.S.A. 60-1501 petition, challenging the adequacy of the Program's treatment regimen. After hearing the testimony and evaluating the evidence submitted by both Burch and the Department for Aging and Disability Services, the district court ruled that because Burch had decided to stop participating in the Program's treatment, he could not prove his treatment was constitutionally deficient. On appeal, Burch again questions the adequacy of his treatment, focusing primarily on whether the Program fails to meet the statute's requirements because it does not directly measure the change in a person's "mental abnormality or personality disorder." After carefully assessing the arguments presented, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Burch was convicted in 1989 of three counts of aggravated criminal sodomy, five counts of indecent liberties with a child, and two counts of sexual exploitation of a child. See *In re Care & Treatment of Burch*, 296 Kan. 215, 218, 291 P.3d 78 (2012). In 2002, a district court ordered that he be committed to the Kansas Sexual Predator Treatment Program—established by the Kansas Sexually Violent Predator Act—at Larned State Hospital. Eighteen years later, Burch remains committed under that Program.

In 2012, Burch filed a petition for a writ of habeas corpus under K.S.A. 60-1501 against the Kansas Department for Aging and Disability Services, asserting several claims relating to the Program. As Burch's case progressed, he and the Department agreed to narrow his claims to two issues: (1) Whether, from June 2002 to March 2012,

Burch's confinement was more restrictive than for inmates imprisoned through the Kansas Department of Corrections; and (2) whether, during that same period, the Program provided Burch adequate treatment (and thus, according to Burch's phrasing, offered a path for his eventual release).

The district court conducted separate hearings on these issues. The issues raised in this appeal are limited to the court's rulings on this second issue—Burch's adequacy-of-treatment claim.

At the evidentiary hearing on this claim, the parties called multiple witnesses who testified about the Program structure and metrics, as well as Burch's progress. From 2002 to 2012, the Program employed a seven-phase treatment system. Each phase addressed specific skills and built on treatment from earlier phases. During these phases, patients would attend recreational therapy and individual- and group-therapy sessions. Recreational therapy activities allowed staff to gauge whether a patient could communicate and cooperate with others. In group therapy, patients discussed sex-offense-specific treatment, while patients in individual therapy could discuss any concerns.

Phases I through IV were inpatient periods. In Phase I, patients learned about the Program and began developing skills such as participating in groups. Phase II consisted of a 12-month academic period during which patients took classes on subjects such as anger management, human sexuality, and relapse prevention. In Phase III, patients began applying Phase II concepts. And during Phase IV, patients created, presented, and refined a relapse prevention plan to manage their sexual impulses.

Phases V through VII were transitional, outpatient periods. Phase V entailed supervised community outings, during which staff gauged how patients applied their inpatient experiences to other settings. In Phase VI's transitional release, patients would move to a new location where they would find a job, pay bills, and become self-

sufficient. Finally, in Phase VII's conditional release, patients would find housing and gain more independence. After five years on conditional release, the patient could petition the court for release from the Program. Movement to Phase V required institutional approval, and the transition to Phase VI required both institutional and court approval. K.S.A. 2019 Supp. 59-29a08(g).

To gauge whether a person could advance to the next treatment phase, the Program measured changes using Treatment Needs Assessment (TNA) scores. The TNA was an assessment tool designed by the Program, using concepts generally accepted in the field of sex-offender treatment. Using a 10-point scale, staff rated patients in 14 categories, including personal responsibility, relationship skills, self-awareness, transparency/secrecy, and insight. The Program required patients to achieve and maintain certain TNA scores to advance to the next treatment phase. Since staff based their scores on how patients participated in treatment, staff could not assess a patient's progress if the patient did not participate.

Each year, the Program would submit an annual report of a patient's progress to the court, as required by K.S.A. 2019 Supp. 59-29a08. Multiple staff members contributed to these reports, and the patient could participate in the process through an interview. But the ultimate recommendation as to whether a person was ready for transitional release was based on Program progress and TNA scores.

Burch entered the Program in June 2002. He entered Phase V—the first transitional stage—in November 2006 and stayed there until March 2008. During a search in January 2008, Program staff found a glass bottle of cologne and two inappropriate movies in Burch's room. Possessing the glass bottle violated Program rules, and though the Program's movie committee had approved one of the movies, staff deemed it was inappropriate for Burch. As a result, Burch was demoted to Phase IV (an inpatient commitment). He was later demoted to Phase II for not participating in

5

treatment. The district court found that since July 2009, Burch's participation in treatment has been "virtually nonexistent."

Dr. Austin DesLauriers, the Program Director from 1996 until 2014, testified that of the 250 patients admitted to the Program during that time, only 3 had been released. He also testified the Program gauges patients' volitional control and propensity to commit sexual violence by examining treatment progress. Other Program employees testified similarly.

Burch called several witnesses who stated he had never acted out sexually. He also called an expert, Dr. Robert Barnett, who analyzed Burch four times between 1999 through 2012 and has conducted dozens of evaluations for other Program patients. Dr. Barnett testified he does not use risk assessments; instead, he relies on his clinical experience to make recommendations. Based on his experience and evaluations of Burch, Dr. Barnett testified Burch has no mental abnormality and can control his behavior. Dr. Barnett gave his opinions that Burch's treatment in the Program was so minimal as to be nonexistent and that the Program's progression requirements were so vague that Burch lacked a path to ever being released.

After the evidentiary hearing on Burch's adequacy-of-treatment claim, the district court issued a memorandum decision denying Burch's petition. The court noted that although Burch made significant progress early in his treatment, he later "encountered problems, broke rules, lost phase levels, and ultimately stopped participating in treatment." The court ruled that since Burch had decided to disengage from treatment, Program staff could not evaluate whether he could safely be released. Thus, Burch had not carried his burden of proof to show shocking or intolerable conduct or a continuing constitutional violation under K.S.A. 60-1501. Burch appeals.

DISCUSSION

Burch has presented claims regarding various aspects of the Kansas Sexual Predator Treatment Program to this court and others on several previous occasions. See *Burch v. Kansas Department for Aging and Disability Services*, No. 121,511, 2019 WL 6795825 (Kan. App. 2019) (unpublished opinion), *petition for rev. filed* December 26, 2019; *Burch v. Keck*, 56 Kan. App. 2d 1162, 444 P.3d 1000 (2019); *In re Care & Treatment of Burch*, No. 116,600, 2017 WL 3947430 (Kan. App. 2017) (unpublished opinion), *rev. denied* 307 Kan. 987 (2018); *In re Care & Treatment of Burch*, No. 116,370, 2017 WL 2403389 (Kan. App. 2017) (unpublished opinion); *Burch v. Ash*, No. 116,599, 2017 WL 2021067 (Kan. App. 2017) (unpublished opinion); *Burch v. Bruffett*, No. 116,150, 2017 WL 754250 (Kan. App. 2017) (unpublished opinion); *Burch v. Bruffett*, No. 113,607, 2015 WL 7693761 (Kan. App. 2015) (unpublished opinion); *Burch v. Sullivan*, No. 109,175, 2013 WL 6389201 (Kan. App. 2013) (unpublished opinion), *rev. denied* 301 Kan. 1045 (2015); *Merryfield v. Sullivan*, No. 109,039, 2013 WL 4730565 (Kan. App. 2013) (unpublished opinion), *rev. denied* 299 Kan. 1270 (2014); *Burch v. Lynch*, No. 108,798, 2013 WL 2972822 (Kan. App. 2013) (unpublished opinion), *rev. denied* 298 Kan. 1201 (2013); *Merryfield v. Jordan*, No. 106,574, 2012 WL 3171872 (Kan. App. 2012) (unpublished opinion), *rev. denied* 297 Kan. 1246 (2013); *Burch v. Lynch*, No. 106,612, 2012 WL 718991 (Kan. App. 2012) (unpublished opinion); *In re Care & Treatment of Burch*, No. 102,468, 2010 WL 3324271 (Kan. App. 2010) (unpublished opinion), *aff'd* 296 Kan. 215, 291 P.3d 78 (2012); see also *Burch v. Jordan*, No. 07-3236-JAR, 2007 WL 4163637 (D. Kan. 2007) (unpublished opinion), *refiled Burch v. Jordan*, No. 07-3236, 2010 WL 5391569 (D. Kan. 2010) (unpublished opinion), *aff'd sub nom. Burch v. Jordan*, 444 Fed. Appx. 236 (10th Cir. 2011) (unpublished opinion).

Burch initiated this case under K.S.A. 60-1501 in 2012. A petition filed under this statute "must allege shocking and intolerable conduct or continuing mistreatment of a

constitutional stature." *Grammer v. Kansas Dept. of Corrections*, 57 Kan. App. 2d 533, Syl. ¶ 1, 455 P.3d 819 (2019). While Burch's amended petition presented two claims for the district court's consideration—one comparing the Program's restrictions to those of inmates in the Kansas Department of Corrections and one challenging the adequacy of the Program's treatment—Burch has not appealed the court's ruling on the restrictive-confinement question. Thus, the sole issue presented for appeal is Burch's argument that the Sexual Predator Treatment Program did not provide adequate treatment under the Sexually Violent Predator Act. Accord *Bergstrom v. Noah*, 266 Kan. 847, 873, 974 P.2d 531 (1999) ("'Where the appellant fails to brief an issue, that issue is waived or abandoned.'").

Burch correctly asserts that the Act requires the Department to provide "control, care and treatment" for committed persons like Burch "until such time as the person's mental abnormality or personality disorder has so changed that the person is safe to be at large." K.S.A. 2019 Supp. 59-29a07(a). Burch argues that the Program is designed with various therapeutic goals, not the "mental abnormality or personality disorder" language from the statute. According to Burch, the Program's disregard of this statutory requirement—coupled with the reality that only three people have ever been released from treatment under the Program—amounts to "shocking and intolerable conduct" and a continuing violation of his due process rights under K.S.A. 60-1501.

1. *Burch's claims regarding the Program's previous treatment regimen are not moot.*

Before evaluating the merits of Burch's adequacy-of-treatment claim, we must consider the Department's assertion that his petition no longer presents a justiciable controversy. More specifically, the Department argues that Burch's adequacy-of-treatment claim is moot, as the Sexual Predator Treatment Program has adopted a new structure and diagnostic assessment since Burch filed his K.S.A. 60-1501 petition. Because the Program has changed and Burch's petition challenged the previous treatment

8

structure, the Department asserts that this case no longer presents conduct the court can remedy.

Kansas appellate courts "do not decide moot questions." *State v. Montgomery*, 295 Kan. 837, Syl. ¶ 2, 286 P.3d 866 (2012). Instead, a court "'determine[s] real controversies relative to the legal rights of persons and properties which are actually involved in the particular case properly brought before it'" and "'adjudicate[s] those rights in such manner that the determination will be operative, final, and conclusive.'" *State v. Bennett*, 288 Kan. 86, 89, 200 P.3d 455 (2009) (quoting *Board of Johnson County Comm'rs v. Duffy*, 259 Kan. 500, 504, 912 P.2d 716 [1996]).

The mootness doctrine stems from Kansas' case-or-controversy requirement. *State ex rel. Morrison v. Sebelius*, 285 Kan. 875, 890-91, 179 P.3d 366 (2008). A justiciable controversy involves "definite and concrete issues"—that is, "'adverse legal interests that are immediate, real, and amenable to conclusive relief.'" *Montgomery*, 295 Kan. at 840 (quoting *Morrison*, 285 Kan. at 890-91). A case becomes moot "when the controversy between the parties has ended and any judgment of the court would be ineffective." *Kerry G. v. Stacy C.*, 55 Kan. App. 2d 246, 248, 411 P.3d 1227 (2018).

At the same time, Kansas courts have recognized that a case "is not moot where it may have adverse legal consequences in the future." *Montgomery*, 295 Kan. 837, Syl. ¶ 4. Given the finality of a mootness determination, an appeal "will not be dismissed as moot unless it clearly and convincingly appears that the actual controversy has ceased and the only judgment which could be entered would be ineffectual for any purpose." 295 Kan. 837, Syl. ¶ 3.

Since Burch filed his K.S.A. 60-1501 petition in 2012, the Program's structure has been reorganized. Instead of the previous seven-phase system, the Program now uses a three-tier approach. Tier I involves in-patient treatment where patients show they can

9

manage their behavior. Tier II incorporates supervised community outings to gauge how well patients can apply what they have learned to a community environment. And Tier III focuses on reintegration; patients go on unsupervised outings, move into a reintegration facility, obtain a driver's license, buy a car, and get a job.

The Program has also replaced the TNA with a different assessment tool, the Sex Offender Treatment Intervention Progress Scale (SOTIPS). SOTIPS uses a "16-item rating scale designed to assess dynamic risk among adult male sex offenders and degree of change at 6-month intervals during treatment." Graders use a four-point scale to assess factors such as sexual attitudes, sexual risk management, antisocial behavior, supervision cooperation, treatment cooperation, problem solving, and emotion management.

Various witnesses at Burch's evidentiary hearings discussed these differences, though the court's decision below focused on the system in place at the time Burch filed his petition. There are certainly similarities between the previous and current Program structures: The Program's previous Phases I through IV are now essentially incorporated into Tier I; Phase V is similar to Tier II; and Phases VI and VII are akin to Tier III. And SOTIPS is very similar to the TNA. While the TNA used a 10-point scale assessing 14 criteria in 90-day increments, SOTIPS uses a 4-point scale to assess 16 criteria in 180-day increments. Some TNA metrics overlap with SOTIPS categories, and others do not.

Since the changes generally relate to the Program's form rather than its substance, we conclude the Program has not so changed as to render Burch's adequacy-of-treatment claim moot. Burch's main argument—that the Program does not use the statutory assessment criteria by evaluating patients' change in "mental abnormality or personality disorder"—transcends the style of assessment used. This argument remains relevant whether the Program employs a phase- or tier-based system, or whether it uses the TNA or SOTIPS assessment tools. Thus, we cannot say "the actual controversy has ceased" or

10

that a decision in this case "would be ineffectual for any purpose." *Montgomery*, 295 Kan. 837, Syl. ¶ 3. We therefore turn to Burch's adequacy-of-treatment claim.

2. *Because Burch has declined to participate in the Program's treatment, he does not have standing to challenge the adequacy of its treatment choices.*

Burch brings a two-pronged challenge to the Program's treatment choices. First, he asserts the Program fails to measure committed persons' readiness for release under the standards articulated by the Act and instead uses different treatment assessments and goals. Accord K.S.A. 2019 Supp. 59-29a07(a) (permitting commitment "until such time as the person's mental abnormality or personality disorder has so changed that the person is safe to be at large"). Second, he points to the Program's low matriculation rate—only three persons have been released—to argue these chosen treatment goals "ultimately [have] proven to be a failure." According to Burch, this combination rises to "shocking and intolerable conduct," and the "prolonged indifference" by the Program "represents a continuing mistreatment of a constitutional stature."

As the district court noted, however, Burch's claim faces a hurdle of his own making—a person must participate in the treatment in order to bring a legal challenge regarding its adequacy. In *Johnson v. State*, 289 Kan. 642, 215 P.3d 575 (2009), our Kansas Supreme Court declined to reach the merits of a similar facial challenge to the Sexual Predator Treatment Program when the petitioners had declined to participate in treatment. The court observed that the petitioners "only have standing to assert constitutional infirmities in the program as applied to them." 289 Kan. at 651. Without showing the Program violated their individual rights, the petitioners had no standing to challenge "how the program impacts others." 289 Kan. at 651.

Thus, the controlling question in *Johnson* was not the petitioners' broad challenge to the Program's treatment goals, but whether the Program had provided inadequate treatment *to the petitioners themselves*. Because the petitioners had declined to participate

11

in the Program's treatment regimen, there was no way to determine whether the Program's treatment, "as applied to them, has been or will be effective." 289 Kan. at 655. The petitioners were instead asking the court "to consider . . . the hypothetical question of whether the program would fail to provide constitutionally adequate treatment *if* they complied with the treatment program." 289 Kan. at 655. The answer to such a question would be an advisory opinion, which Kansas courts cannot render. 289 Kan. at 655-56; see *Montgomery*, 295 Kan. 837, Syl. ¶ 2; *Morrison*, 285 Kan. at 890-91.

In this case, the record reflects that shortly after Burch was moved from the transitional Phrase V back to inpatient Phase IV, he declined to participate in treatment. Burch's annual report in 2011 noted he had "made no therapeutic progress in the program during the last year," largely due to "his own decision to not participate in treatment activities." The report further noted that Burch's decision to decline treatment was "very conscious and declared." He has not progressed through the Program's treatment phases or tiers. In fact, the district court described Burch's participation in treatment since July 2009 as "virtually nonexistent."

We are conscious that Burch's decision to stop cooperating in his treatment under the Program may stem from his frustration and disagreement with the Program's treatment choices. But "mere disagreement with reasonable and prescribed treatment does not establish a constitutional deprivation." *Johnson*, 289 Kan. at 656. If Burch does not participate in the Program's treatment, he "cannot establish the program is ineffective as applied to" him. See 289 Kan. at 656. That is, without participating in treatment, he cannot demonstrate the Program's treatment regimen is inadequate or is an unconstitutional impediment to his release—if that is indeed the standard a court would apply. Cf. 289 Kan. at 654-55 (noting jurisdictional disagreement about standard for evaluating treatment in civil commitment programs but declining to reach issue due to petitioners' lack of standing).

Because Burch cannot show the Program's treatment is inadequate as applied to him, he has no standing to assert speculative claims as to whether the Program provides adequate treatment to those who choose to participate in its requirements. See 289 Kan. at 656. Like the district court, we conclude Burch lacks standing to assert a broad facial challenge against adequacy of the treatment—including the treatment choices and assessment criteria implemented—provided under the Program.

3. *The Program's treatment regimen is consistent with the statutory criteria established under the Sexually Violent Predator Act.*

The *Johnson* court recognized a limited exception to this standing requirement, finding noncompliance does not prevent consideration of a petitioner's challenge when the "treatment [is] so lacking that it could be deemed the personnel were indifferent or the requirements of the program were otherwise egregious and shocking." 289 Kan. at 656. *Johnson* found this exception inapplicable there, summarily concluding the treatment under the same seven-phase system Burch challenges here "is not shocking to the conscience." 289 Kan. at 656.

In *Johnson*, the petitioners argued that the treatment offered under the Program was constitutionally inadequate because it was not designed to "cure" them of their pedophilia or offer a possibility of release. To the extent that Burch raises similar challenges to the Program's assessment criteria and other treatment choices, he lacks standing to assert those claims. Cf. *Youngberg v. Romeo*, 457 U.S. 307, 322-23, 102 S. Ct. 2452, 73 L. Ed. 2d 28 (1982) (courts defer to the judgment of medical professionals when assessing and establishing treatment); *Merryfield v. State*, 44 Kan. App. 2d 817, 821-22, 241 P.3d 573 (2010) (acknowledging courts should generally defer to professionals' judgment regarding treatment methods but stating that standard should not be applied at the summary dismissal stage).

Burch raises an additional question not argued in *Johnson*, however: Whether the Program has demonstrated indifference to the Act's statutory mandate by basing its treatment goals on criteria other than the Act's "mental abnormality or personality defect" language. In other words, is the Program's treatment regimen consistent with the mandates of the Sexually Violent Predator Act? See 289 Kan. at 653 (indifference to statutory mandates may be "shocking" within the meaning of K.S.A. 60-1501). Unlike the issue raised by the *Johnson* petitioners, our consideration of Burch's statutory claim would not result in an advisory opinion, as it goes to the statutory structure of the Program itself. Thus, we proceed to the merits of Burch's claim to the limited extent it compares the Program's treatment regimen to the Act's statutory requirements.

The commitment and review procedures under the Act have remained substantially unchanged since Burch's commitment in 2002. The original decision whether a person is a sexually violent predator—and thus should be civilly committed to the Program—is made by a court or jury. See K.S.A. 2019 Supp. 59-29a06. K.S.A. 2019 Supp. 59-29a07(a) provides that once this determination is made, "the person shall be committed to the custody of the secretary for aging and disability services for control, care and treatment until such time as the person's mental abnormality or personality disorder has so changed that the person is safe to be at large."

To assess whether this standard has been met (or whether a person committed under the Act should be released), Kansas law requires "a current examination of the person's mental condition [to be] made once every year." K.S.A. 2019 Supp. 59-29a08(a). The Secretary of the Department for Aging and Disability Services then must provide each committed person with notice of the right to challenge a recommendation of continued commitment. K.S.A. 2019 Supp. 59-29a08(a). If a hearing is requested, the committed person bears the burden to prove "probable cause to believe the person's mental abnormality or personality disorder has significantly changed." K.S.A. 2019 Supp. 59-29a08(d). If no hearing is requested, the court that originally committed the person to

14

the Program must conduct an "in camera annual review of the status of the person's mental condition and determine whether the person's mental abnormality or personality disorder has significantly changed so that an annual review hearing is warranted." K.S.A. 2019 Supp. 59-29a08(f).

Burch argues that under these statutes, the Program's treatment must be geared toward assessing a committed person's "mental abnormality or personality disorder." He asserts that the testimony at his evidentiary hearing demonstrated that the Program had disregarded this standard and instead employed a different treatment regimen. In particular, Burch points to the testimony of Keri Applequist, who served as a Program therapist from 1998 until 2013. When asked how she assessed whether a person's mental abnormality had changed, Applequist explained, "As a therapist, I look at the therapeutic qualities of treatment . . . . I don't look at the legal terms. I look at it from the therapeutic terms." Burch argues this testimony demonstrates Program staff were ignoring statutory requirements, employing instead the TNA and phase-based treatment structure.

Contrary to Burch's arguments, however, the Act does not demand that a committed person's treatment be phrased in terms of his or her "mental abnormality or personality disorder." Instead, the Act differentiates between the ultimate legal standard a court must consider in determining whether a person should be advanced in (or released from) the Program and the broader question of the person's treatment. The legal standard—whether a person's "mental abnormality or defect has so changed that the person is safe to be at large"—balances numerous considerations, including the person's current mental condition, the previous reasons for commitment, and public safety. See K.S.A. 2019 Supp. 59-29a07(a); K.S.A. 2019 Supp. 59-29a08(d), (f). In contrast, the Act's provisions concerning treatment professionals' assessments of their patients do not incorporate this standard; these provisions more broadly reference the treated person's "mental condition." See K.S.A. 2019 Supp. 59-29a08(a), (f).

15

Though this distinction is found throughout the Act, one example appears in K.S.A. 2019 Supp. 59-29a08(f). This statute concerns a court's review of the Department's annual report and recommendation for a patient who does not request a hearing challenging his or her commitment. In such circumstances, the Act directs the court to "conduct an in camera annual review of *the status of the person's mental condition* and *determine whether the person's mental abnormality or personality disorder has significantly changed* so that an annual review hearing is warranted." (Emphases added.) K.S.A. 2019 Supp. 59-29a08(f). That is, the court must review the information provided from the Department regarding the person's treatment—"the status of the person's mental condition"—and then reach a conclusion as to the ultimate legal standard—"whether the person's mental abnormality or personality disorder has significantly changed" to necessitate a hearing.

In upholding the constitutionality of the Act in a previous facial challenge, the United States Supreme Court observed that courts "have never required state legislatures to adopt any particular nomenclature in drafting civil commitment statutes." *Kansas v. Hendricks*, 521 U.S. 346, 359, 117 S. Ct. 2072, 138 L. Ed. 2d 501 (1997). And legal phrases, "which must 'take into account such issues as individual responsibility . . . and competency,' need not mirror those advanced by the medical profession." 521 U.S. at 359 (quoting American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders xxiii, xxvii [4th ed. 1994]). The Act's reference to a change in a person's "mental abnormality or personality disorder" is part of the ultimate legal test applied by courts assessing whether a person should continue to be committed under the Act. It does not establish or require a certain standard for treatment purposes.

Contrary to Burch's statutory argument, the Act does not require the Program's treatment regimen to be phrased in terms of its ultimate legal standard. Instead, the Act allows treatment professionals freedom to adopt a treatment program and assessment tools to address the Program's statutory charge—"providing treatment and protecting the

16

public." See *Johnson*, 289 Kan. at 650; *In re Care & Treatment of Hay*, 263 Kan. 822, 832-33, 953 P.2d 666 (1998). The district court did not err in denying Burch's petition for a writ of habeas corpus under K.S.A. 60-1501.

Affirmed.